RECEIVED
MAR 31 2015
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| CAREN ALLEN, ET AL. | CIVIL ACTION NO. 1:12-cv-2324 |
| -vs- | JUDGE DRELL |
| EDWARD PICKLE, ET AL. | MAGISTRATE JUDGE KIRK |

## RULING

Pending before the Court is a motion for summary judgment (Doc. 59) filed by Defendants Richard Alwood and Farmers Insurance Exchange ("Farmers") and a partial motion for summary judgment (Doc. 86) filed by Plaintiffs Caren Allen, Ashlyn Allen, and Katie Allen (collectively, "Plaintiffs"). We have considered the filings and evidence in the record and the parties' arguments contained in their briefs. For the following reasons, the motions (Docs. 59, 86) will be **GRANTED**.

I.  Background

With the throttle wide open and the engine trimmed up, Bruce Pickle had his 2008 Ranger Comanche Bass Boat up on plane and flying through Lake St. John at 50 to 70 miles per hour. Mr. Pickle had a few beers in his system, a few more in the cooler, and his buddy Larry Allen along for the ride. However, this was not a fun summer afternoon outing on the lake. No, it was a pitch black, moonless night, and an intoxicated Mr. Pickle was whizzing along without a spotlight. Unfortunately, this adrenaline-inducing thrill ride ended swiftly and tragically. A little after midnight, Mr. Pickle veered too near the shoreline, narrowly missed a Cypress tree, and

crashed full speed into Richard Alwood's wooden pier and boathouse. The force of the impact utterly demolished Mr. Alwood's dock and Mr. Pickle and his passenger, Mr. Allen, apparently were killed in the impact.

The survivors of Larry Allen brought suit against Mr. Pickle's estate and insurer alleging "the death of Larry Ray Allen was caused directly and exclusively by the gross negligence and reckless conduct of the deceased Bruce Farr Pickle and by his reckless disregard for the safety of his passenger by (a) operating the boat at night in an area of limited night visibility, and by (b) operating the boat in an intoxicated condition, and by (c) operating the boat at a high rate of speed" (Doc. 1). Plaintiffs later amended their complaint to assert claims against Mr. Alwood and his insurer on the basis that the condition of his dock caused the accident (Docs. 17, 22).[1] Plaintiffs have alleged that a red reflector had previously fallen off the east side of the dock, which reflector otherwise "would have been clearly visible to Mr. Pickle as his boat approached the boathouse and swimming dock from the east *if any lights on the boat were turned on*, and would more likely than not have prevented the accident completely" (Doc. 17) (emphasis added). Plaintiffs also have asserted that the dock "constituted a hazard to navigation under admiralty or general maritime law and thus the doctrine of strict liability applies." Id.

The Plaintiffs have settled with Mr. Pickle's estate and insurer (Doc. 30). This Court dismissed Plaintiffs claims against them (Doc. 31), leaving Richard Alwood and Farmers Insurance Exchange as the remaining defendants.

---

[1] The second amended complaint (Doc. 22) only served to identify Mr. Alwood's insurer as Farmers Insurance Exchange, which had been so called "ABC Insurance Company" in the first amended complaint (Doc. 17).

Defendants Alwood and Farmers moved for summary judgment on the claims against them (Doc. 59). In their motion, they invoked two presumptions under maritime law: (1) when a moving vessel allides[2] with a fixed object, the moving vessel is presumed to have been at fault, See The Oregon, 158 U.S. 186 (1895); and (2) when a vessel violates a safety rule established by statute or regulation, the vessel owner bears the burden of proving "not merely that h[is] fault might not have been one of the causes, or that it probably was not, but that it could not have been" the cause of the collision.[3] See The Pennsylvania, 86 U.S. 125, 136 (1873). Together, The Oregon Rule and The Pennsylvania Rule create a presumption that the operator of the vessel, Bruce Pickle, was both at fault and the cause of the accident and resulting damages. Plaintiffs would have the burden of rebutting these presumptions.

In opposing the Defendants' motion, Plaintiffs argue that Admiralty jurisdiction and, thus, The Orgeon and The Pennsylvania Rules do not apply because the allision occurred on Lake St. John, which is a land-locked lake contained completely within the State of Louisiana (Doc. 79). To assert this argument, Plaintiffs oddly filed a motion for partial summary judgment (Doc. 86) seeking a determination that maritime law indeed does not apply to the issue in this case, despite their petition pleas to the contrary. Defendants have opposed that motion (Doc. 89).

Subsequent to the filing of Defendants' summary judgment motion, Plaintiffs amended their complaint a third time to allege that the presence of turned-off Christmas lights on Mr. Alwood's boathouse was "a substantial factor in causing the

---

[2] "The contact of a vessel with a stationary object such as an anchored vessel or a pier." ALLISION, Black's Law Dictionary (10th ed. 2014).
[3] The Pennsylvania Rule is not limited to collision cases, but is applicable generally in maritime torts, including allisions. See Candies Towing Co. v. M/V B & C Eserman, 673 F.2d 91, 94 (5th Cir. 1982).

accident" (Doc. 64). The argument goes like this: Plaintiffs contend that a dock with Christmas lights on it surely would have been visible to Mr. Pickle in time to avoid the crash (or for Mr. Allen "to make a timely escape from the boat in time to save his life") and, therefore, the lights, the existence of which is not contested, must not have been working at the time. Id.

II. <u>Law and Analysis</u>

We first consider whether maritime law applies to the issues in this case. Second, we consider whether the Defendants are entitled to summary judgment on the claims asserted against them by the Plaintiffs.

    A.    Applicability of Maritime Law

For federal maritime law to apply on inland waterways, the Court must be satisfied that (a) the alleged tort occurred on navigable water and (b) the activity giving rise to the incident bears a substantial relationship to traditional maritime activity. See <u>Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.</u>, 513 U.S. 527, 532-34 (1995). The first step is to determine whether the allision in this case occurred on navigable water.

> The term "navigable waters of the United States" is a term of art that refers to bodies of water that are navigable in fact. This includes waters used or capable of being used as waterborne highways for commerce, including those presently sustaining or those capable of sustaining the transportation of goods or passengers by watercraft. To qualify as "navigable waters," bodies of water must form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water.
>     A body of water that is completely landlocked within a single state is not navigable for purposes of admiralty jurisdiction. It is important to note, however, that a body of water need not flow between two states or into the sea to be navigable. A body of water may be

>navigable even if it is located entirely within one state as long as it flows into another body of water that, in turn, flows into another state or the sea. . . .
>
>     . . . If [an] obstruction precludes interstate or foreign commerce, the body of water has become nonnavigable and will not support admiralty jurisdiction. The fact that a body of water was historically navigable does not mean that it will remain so in the future.

ROBERT FORCE, ADMIRALTY AND MARITIME LAW 4 (2d ed. 2013) (internal citations omitted).

Here, Lake St. John is a landlocked lake completely within the state of Louisiana. It does not flow into the Mississippi River or connect to any other body of water at any point during the year. While Defendants argue that, as an "oxbow lake," Lake St. John was navigable, historical navigability is not sufficient to support admiralty jurisdiction. See id. Furthermore, Defendants' reliance on Louisiana cases deeming Lake St. John navigable under state law is misplaced. Navigability of water under the Civil Code is irrelevant to the issue of whether a waterway is navigable under federal maritime law. Because the allision did not occur on navigable water, maritime law is not applicable in this case. Consequently, Plaintiffs claim that Mr. Alwood's dock constituted a hazard to navigation under maritime law has no merit and will be dismissed.

    B.    Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider all "evidence in the light most favorable to the party resisting the motion." Trevino v.

Celanese Corp., 701 F.2d 397, 407 (5th Cir. 1983). However, the non-moving party does not establish a genuine dispute with "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). It is important to note that the standard for a summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, *and* (2) the movant is entitled to judgment as a matter of law.

"Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Johnson v. Arkema, Inc., 685 F.3d 452, 469-70 (5th Cir. 2012) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "When the burden at trial rests on the nonmovant, the movant must merely demonstrate an absence of evidentiary support in the record for the nonmovant's case." Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V., 199 F.3d 796, 798 (5th Cir. 2000). "[T]he nonmovant may not rely on mere allegations in the pleading" but must "set[] forth particular facts indicating that there is a genuine issue for trial." Id.

### C. Defendants' Potential Liability for the Allegedly Missing Reflector

The Plaintiffs contend that Defendant Alwood, as owner of the connected pier, boathouse, and swimming deck (collectively, "the dock") that allegedly did not have a reflector on the eastern side, is liable to Plaintiffs for damages under La Civ. Code

arts. 2317[4] and 2317.1[5] (Doc. 17). Specifically, Plaintiffs contend in their amended complaint,

> The red reflectors on the eastern edge of the swimming dock would have been clearly visible to Mr. Pickle as his boat approached the boathouse and swimming dock from the east if any lights on the boat were turned on, and would more likely than not have prevented the accident completely, or would have caused Mr. Pickle to reduce his speed prior to the accident, and would more likely than not have prevented the death of Mr. Allen.

(Doc 17).

To recover for damages caused by a defective thing, the Plaintiffs must prove (1) that the thing was in the defendant's custody, (2) that the thing contained a defect which presented an unreasonable risk of harm to others, (3) that this defective condition caused the damage, and (4) that the defendant knew or should have known of the defect. Waller v. Shelter Mut. Ins. Co., 41,215 (La. App. 2 Cir. 6/28/06), 935 So. 2d 288, 291-92. "[I]n order to constitute a defect or unreasonable risk of harm, the defect must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause injury to a prudent person using ordinary care under the circumstances." Id. at 292. Generally, there is no duty to protect against open and obvious hazards. Primrose v. Wal-Mart Stores, Inc., 48,370 (La. App. 2 Cir. 10/2/13), 127 So. 3d 13, 17.

---

[4] "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." La. Civ. Code art. 2317

[5] "The owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care. Nothing in this Article shall preclude the court from the application of the doctrine of res ipsa loquitur in an appropriate case." La. Civ. Code art. 2317.1

Here, the "thing" in question is Defendant Alwood's dock with which Mr. Pickle's boat allided shortly after midnight on June 17, 2012. Mr. Alwood's property on the north shore of Lake St. John was accompanied by a wooden pier that extended southward onto Lake St. John (Doc. 59-15). Toward the end of the pier was a wider, rectangular section of dock covered by a roof (often referred to in the record as the "boathouse") and, built off the end of that was a small swimming deck. Id. According to measurements taken by the Department of Wildlife and Fisheries with a laser range finder, the end of the dock was 171 feet from the shore pre-accident (Doc. 59-5). There were at least a half dozen Cypress trees growing out of the lake on either side of Mr. Alwood's dock (See doc. 59-4 at 12, 18-23). One Cypress tree, on the west side of the boathouse, was approximately 168 feet from shore and another on the east side was about 156 feet from the shore (Doc. 59-5). Mr. Alwood's brother-in-law had installed red reflectors on three sides of the swimming deck: the east, west, and south sides (Doc. 59-15). Mr. Alwood and his brother-in-law also had installed the referenced Christmas strand lights along the rafters of the boathouse that were, according to Mr. Alwood and a neighbor, Jody Foster, visible from the shore and the water (Docs. 59-13, 59-15). Post-accident photos do not show a red reflector on the east side of the swimming deck (Docs. 59-4, 59-13, 59-15). There is no affirmative evidence that a reflector was or was not on the east side that night. One can only speculate as to whether the reflector placed by the brother-in-law fell off prior to the accident or was knocked off during the crash. The record does not reflect this portion of the swimming deck to have been demolished as a result of the allision (Doc. 59-4).

Plaintiffs can satisfy the first element because Mr. Alwood, as an owner, was in custody of the dock. As to the second element, Plaintiffs appear to be arguing that the "defect" in the thing is the supposed lack of that red reflector on the east side of the swimming deck (Doc. 17). Because there is no proof of the absence of the east side reflector at the time of the impact, we can find no evidentiary support for any other possible defect under La Civ. Code art. 2317.1. To the extent it might be argued that the dock itself presented a risk of harm to boaters, such does not satisfy the standard as it was an open and obvious hazard. See Primrose, 127 So. 3d at 17. Mr. Alwood's dock was one of many docks along the shore of Lake St. John (Docs. 59-4 at 24, 59-13). Furthermore, the dock was situated in a veritable minefield of Cypress trees. The dangers of alliding with fixed objects near the shore would have been known and obvious to boaters, especially to Mr. Pickle, because, according to Plaintiff Caren Allen, "all he did was boat and fish and lived [sic] on that water" (Doc. 59-9). Add to that, Mr. Pickle had no lights on the boat to allow him to see anything ahead of him.

Even if the reflector were not present at the time of the allision, this still would not rise to the level of an actionable defect in the thing. From the record, it is obvious that, on the night of the accident, Mr. Pickle was not operating his boat as a prudent person using ordinary care under the circumstances. Mr. Pickle was operating his boat while intoxicated – his blood alcohol content was more than double the legal limit (Docs. 59-5, 59-11). It was a dark, moonless night, and Mr. Pickle was driving in

excess of 50 miles per hour[6] dangerously close to the shore line through a minefield of Cypress trees without the aid of a spot light or anything akin to an automobile's headlights (Docs. 59-5, 59-6).[7] According to Eddie Roberts, who had spent at least thirty five years boating and fishing on Lake St. John, "speed at night is the most dangerous thing on the water you can do." (Doc. 59-6 at 45). We find that Plaintiffs have failed to provide evidentiary support for their claim that Mr. Alwood's dock was defective under La Civ. Code art. 2317.1. Under these circumstances, we cannot say that this dock would be expected to cause injury to a prudent person using ordinary care. See Waller, 935 So. 2d at 292.

Plaintiffs would also have to prove the third element at trial: that Mr. Alwood's dock caused the allision. The Louisiana Department of Wildlife and Fisheries investigated the boating accident and determined there were three factors that caused the accident: (1) alcohol use; (2) restricted vision[8]; and (3) excessive speed (Doc. 59-5 at 43-45). No witness, investigator, expert, or report identifies the allegedly missing reflector as a cause of the accident. Furthermore, Plaintiffs' theory that Mr. Pickle would have seen the reflector in time to avoid the allision is not supported by the record. Reflectors do not generate light; they reflect it (Doc. 59-10). Mr. Pickle was operating his boat without the assistance of a spotlight and he would not be able to

---

[6] There are several estimates of the speed contain in the record ranging from 50 to 70 miles per hour. The estimates were based on several factors, including the position of the throttle, the tachometer reading, and the engine trim (See Docs. 59-5, 59-6, 59-7, 59-10)

[7] The only lights that may have been on in Mr. Pickle's boats (inferred from the switches being in the on position) were interior lights and the bow and aft lights. The bow and aft lights serve the purpose of making the boat visible to other boaters (and indicating the direction of the boat via red for port side and green for starboard side). They do not illuminate a path in front of the boat. (See doc. 59-5 at 44.)

[8] When asked to explain this factor, Sergeant Parish explained, "It was basically at midnight. It is dark. As far as I know, he didn't have any spotlights or anything illuminating his path in front of him other than the bow light of his boat" (Doc. 59-5 at 44). When asked what level of illumination the bow light provides, he responded, "It doesn't provide much at all" and further indicated that they are primarily for other boaters to see. Id. at 44-45.

see a dark reflector at night without a light. There is insufficient evidence for a trier of fact to conclude that the missing reflector was a legal cause of the allision.

Finally, to satisfy the fourth element, Plaintiffs would have to prove that Defendant Alwood knew or should have known of the defect.[9] The record indicates that Mr. Alwood did not know about a possible missing reflector until he was shown post-accident photographs during his deposition (See doc. 59-15). In order to prove that Mr. Alwood should have known the reflector was missing, Plaintiffs would first have to prove the reflector had, indeed, fallen off prior to the allision. As we observed above, the high-speed impact of Mr. Pickle's boat was sufficient to demolish Mr. Alwood's boathouse and very well could have resulted in the reflector's falling off into the lake.

We find that Plaintiffs have failed to make an evidentiary showing sufficient to establish the existence of either the second or third elements of their claim for damages under La Civ. Code arts. 2317 and 2317.1. Defendants are entitled to judgment as a matter of law and Plaintiffs' claims under La Civ. Code arts. 2317 and 2317.1 in the amended complaint will be dismissed with prejudice.

    D.    Defendants' Potential Liability for the Use of Christmas Lights

Concerning the "Christmas lights" claim for damages under La Civ. Code arts. 2315, 2317, and 2317.1, Plaintiffs say, "[t]hose lights were a substantial factor in causing the accident" (Doc. 64). Plaintiffs only theorize that the lights must not have been on at the time of the allision because, if the lights were on, either (a) Mr. Allen would have jumped out of Mr. Pickle's speeding boat in time to save his life or (b) an

---

[9] This is assuming that the missing reflector constitutes a "defect" under Article 2317.1.

intoxicated Mr. Pickle would have responsibly slowed down and safely altered his course.

Plaintiffs bear the burden of proving that the Christmas lights on Mr. Alwood's dock were not illuminated at the time of the allision. If Plaintiffs cannot prove this fact, they cannot establish Mr. Alwood's (and thus Farmers') liability to the Plaintiffs.[10] To get to the heart of the matter, we consider first whether the Defendants have established no genuine dispute that the Christmas lights were lit on the night of the crash. At this summary judgment stage, Defendants need only demonstrate an absence of evidentiary support in the record for this claim. See Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO, 199 F.3d at 798. Plaintiffs may not rely on mere allegations but must point to particular facts that establish a genuine issue for trial. See id.

Again, the record indicates that Mr. Alwood and his brother-in-law had installed colorful Christmas strand lights wrapped around the girders under the roof of the boathouse (Doc. 59-15 at 27-28). They plugged the lights into a timer, which was set so the lights would turn on around dusk and turn off around dawn.[11] Id. Mr. Alwood's neighbor, Jody Foster, also confirmed that Christmas lights had been installed in the boathouse and that they came on automatically in the evenings (Doc. 59-13 at 62). On the Friday before the accident,[12] Mr. Alwood and his family were

---

[10] The converse, however, is not true. If the lights were off, Plaintiffs would still need to prove all the elements of a negligence claim, including duty, breach, cause-in-fact, legal causation, and damages.
[11] According to Mr. Alwood, the timer was not photosensitive, so his brother in law changed the timer a few times a year to keep it close to dusk and dawn. Id. at 31. While Mr. Alwood was not sure exactly what time it was set for on the night of the accident, it certainly was not set to come on well after midnight. See id.
[12] The record indicates that the accident occurred at approximately 12:05 a.m. on Saturday, June 16, 2012 (See doc. 59-10).

busily preparing their backyard for a charity function they were hosting on Saturday (Doc. 59-15 at 28-31). Mr. Alwood affirmatively says the lights came on that evening and were on when he went to bed. Id.

While Plaintiffs argue that Christmas lights are an unreliable lighting source and Mr. Alwood's lights were five years old, they cannot point to any evidence to contradict the affirmative testimony that the lights were on and functioning on the Friday evening preceding the crash. Neither can Plaintiffs point to any evidence suggesting the lights failed in the hours between Friday evening and the midnight accident. Rather, Plaintiffs rely on a *res ipsa loquitur* argument that the lights must have been off because the accident occurred.

Plaintiffs further assert that Defendants bear the burden of explaining (a) why Mr. Allen did not jump out of a speeding boat in the split seconds before the crash and (b) why Mr. Pickle, whose intoxication level was two and a half times the legal limit and who was speeding at night without a spotlight, did not responsibly reduce his speed and alter his course (Doc. 79). The arguments border on the nonsensical. In this scenario, the burden rests squarely with the Plaintiffs to prove by a preponderance of the evidence that Mr. Alwood's lights were not functioning at the time of the accident and that this was a proximate cause of the crash.

The record is devoid of any evidence to support the allegation that Mr. Alwood's Christmas lights were not on at the time of the crash. Plaintiffs cannot establish a genuine dispute with "some metaphysical doubt as to the material facts." Little, 37 F.3d at 1075. Defendants are entitled to judgment as a matter of law.

Moving on, even if Plaintiffs could establish that the dock was not illuminated at the time of the accident, Plaintiffs would still have to prove all of the elements for their tort claims:

### 1. Potential Liability under Article 2315

To establish a negligence claim under La. Civ. Code art 2315, Plaintiffs are required to prove:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages

Thibodeaux v. Trahan, 2011-0328 (La. App. 3 Cir. 10/5/11), 74 So. 3d 850, 853 (quoting La Pac Mfg., Inc. v. TCM Mfg., Inc., 06–748, p. 6 (La.App. 3 Cir. 12/6/06), 944 So.2d 831, 835–36).

In this analysis, Plaintiffs would have to establish that Mr. Alwood had a duty to illuminate the dock. Yet, Plaintiffs cannot point to any statute, ordinance, or regulation requiring Mr. Alwood to illuminate his dock at night. In fact, according to the record, very few of the docks on Lake St. John were illuminated (See docs. 59-5, 59-6). According to Mr. Alwood, the only reason he even left the Christmas lights up year round was he thought they were aesthetically pleasing (Doc. 59-15 at 27). The record does not support a contention that Mr. Alwood had a duty to illuminate his dock all night long.

Second, Plaintiffs would have to establish that Mr. Alwood breached this duty. This element has already been addressed. There is no evidence other than mere

conjecture (contradicted by hard evidence) that the lights were not on at the time of the crash.

Third, Plaintiffs would have to establish that, but for the Christmas lights being off, the crash would not have happened. However, given Mr. Pickle's extreme intoxication and reckless and dangerous behavior, Plaintiffs may not even be able to establish cause-in-fact.

Fourth, Plaintiffs would have to establish that the lack of illumination on the dock was a proximate cause of the allision. Under the Louisiana "scope of the risk" approach to negligence, Plaintiffs would have to show it was foreseeable that boaters might be speeding on Lake St. John at night, without the assistance of a spot light, close to the shoreline, docks, and Cypress trees. Furthermore, Plaintiffs would have to show that Mr. Pickle's reckless and criminal [13] behavior was not a superseding cause of the allision.

Fifth, Plaintiffs would have to prove injury. In this case, the injury is readily apparent.

We find that Plaintiffs have failed to make a showing sufficient to establish the existence of any of the first four elements of their claim for damages. Defendants are entitled to judgment as a matter of law. Plaintiffs' claims against the Defendants under La Civ. Code art 2315 will be dismissed with prejudice.

---

[13] "The crime of operating a vehicle while intoxicated is the operating of any motor vehicle, aircraft, *watercraft, vessel*, or other means of conveyance when any of the following conditions exist:(a) The operator is under the influence of alcoholic beverages. (a) The operator is under the influence of alcoholic beverages. (b) The operator's blood alcohol concentration is 0.08 percent or more by weight based on grams of alcohol per one hundred cubic centimeters of blood." La. Rev. Stat. 14:98 (emphasis added).

    2. Potential Liability under La Civ. Code arts. 2317 and 2317.1

The analysis for these claims is substantially similar to our extensive review of Plaintiffs claims regarding the missing reflector. The alleged lack of illumination was not the "cause" of the accident here for the same reason it was not the cause under La Civ. Code art. 2315. Finally, Plaintiffs cannot prove the fourth element because Mr. Alwood affirmatively stated the lights were on when he went to bed. There is no evidence to contradict this; nor is there any reason he should have known if the lights had failed between the time he went to bed and the midnight crash. Likewise Defendants are entitled to summary judgment on these claims.

III.    Conclusion

For the foregoing reasons, we find Defendants have shown there is no genuine dispute as to any material fact concerning Plaintiffs' claims, and find Defendants are entitled to judgment as a matter of law. Accordingly, Plaintiff's Motion for Partial Summary Judgment will be **GRANTED**, and Defendants' Motion for Summary Judgment will be **GRANTED**. This suit will be **DISMISSED with PREJUDICE**.

SIGNED on this 31 day of March, 2015 at Alexandria, Louisiana.

                                        DEE D. DRELL, CHIEF JUDGE
                                        UNITED STATES DISTRICT COURT